55 N.J. Super. 1 (1959)
149 A.2d 839
GEORGE M. HODGSON, PLAINTIFF-RESPONDENT,
v.
LEROY APPLEGATE AND CLARA E. APPLEGATE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1958.
Decided March 20, 1959.
*4 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Joseph M. Alsofrom argued the cause for defendants-appellants.
Mr. Martin L. Haines argued the cause for plaintiff-respondent (Mr. Howard G. Stackhouse, attorney; Messrs. Dimon, Haines & Bunting, of counsel; Mr. Dominick J. Ferrelli, of counsel and on the brief).
*5 The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff George M. Hodgson, lessee of a two-bay service station in Woodland Township, Burlington County, brought this action to recover damages from the defendant-lessors, LeRoy Applegate and his wife, Clara E. The defendants were unable to deliver possession of the premises to plaintiff because the present operator of the service station, Herbert A. Cooper, exercised an option to renew his lease. The action was brought upon the theory that defendants were liable for breach of lease and for fraudulent non-disclosure of Cooper's option to renew. A jury of the Burlington County Court returned a verdict for plaintiff in the amount of $8,500, and a judgment was entered accordingly on April 9, 1958.

I.
On May 13, 1958, 34 days after the entry of the judgment, defendants served notice of a motion to set aside the judgment upon the following grounds:
"* * * that the said judgment was obtained by fraud and that the defendant has since obtained newly-discovered evidence, which would probably alter the judgment, and on the further ground, as specified under R.R. 4:62-2(a), (b), (c) and (f)."
On June 5, 1958, 57 days after the entry of the judgment, defendants filed an amended notice of motion to vacate which included two further reasons for setting aside the April 9 judgment: (1) that there was "basic error committed in the record" in that an improper measure of damages had been employed at the trial, and there was no evidence to support the claim of fraud; and (2) there were "basic error[s] in the Court's charge to the jury." The hearing on the motion to vacate was postponed until June 18, 1958, at which time the county judge denied the application. The defendants appeal from the denial of this motion.
Hodgson's complaint contained three counts: the first sought damages for loss of profits resulting from defendants' *6 inability to perform the contract of lease; the second, for compensatory damages suffered as a result of reliance upon the Applegates' representations that they were the owners of the premises in question when in fact there was an outstanding lease to Cooper; the third, for punitive damages based upon the malicious failure to disclose the prior lease. The defendants filed a counterclaim for rescission and reformation of the plaintiff's lease, but the court dismissed it upon the rendition of the jury verdict.
The Cooper lease ran for one year, beginning on May 15, 1956, and contained an option to renew for nine additional years, to be exercised by notice on or before April 1, 1957. Before November 1956 defendants had some differences with Cooper respecting the payment of rent and of other obligations. Believing that he would vacate on or before the expiration of the initial term, they apprised the plaintiff that they were interested in leasing the premises to him and his sons, who operated service stations at other locations.
On November 2, 1956 plaintiff and defendants signed the following memorandum:
"This agreement between LeRoy Applegate & Clara his wife as the lessors & George E. Hodgson, Thomas B. Hodgson, Lester Hodgson, and William Hodgson, the lessees, hereby agree to lease the Gulf Refining Station owned by the Applegates to the Hodgson boys, the leasees (sic), for a term of ten years at the rate of $200 per month minimum, and the gallonage under or above at the rate of three quarters of one cent per gallon.
A deposit of $10.00 is to bind this agreement until a permanent lease is drawn. Possession to be granted as soon as present tenant has vacated the property but it is the understanding that this date will not exceed the date of April 1, 1957.
 Signed by
 LeRoy Applegate /s/
 Clara E. Applegate
 Attested by
 John Middleton /s/
 For
 George M. Hodgson /s/
 GEORGE M. HODGSON"
Plaintiff's attorney proceeded to prepare the permanent agreement, and on November 10, 1956 the lease was signed *7 and executed by plaintiff and defendants. It recited that it was "for the term of ten years from the date of possession on (sic) which shall be on or before April 1, 1957."
At the trial, which commenced on April 7, 1958 and lasted for three days, plaintiff contended that defendants had represented that Cooper's lease was for a one-year term, that they had not mentioned Cooper's option, and that plaintiff was unaware of it. In this respect plaintiff was corroborated by John Middleton, a realtor who had drawn and witnessed the memorandum quoted above, and by plaintiff's attorney who had drawn the lease and attended to its execution. Defendants testified, however, that they had informed plaintiff and his attorney of Cooper's option and that Cooper had been in default in the payment of obligations under the lease. They claimed that the attorney had said Cooper could be evicted and that the attorney offered to prosecute such proceedings on defendants' behalf. Subsequently, when defendants sought to employ him to bring an eviction action, he refused because of conflict of interest. Defendants brought dispossess proceedings which terminated in Cooper's favor, and he exercised the option of renewal. Therefore, defendants were unable to deliver possession to plaintiff.
The insertion in the lease of April 1, 1957 as the date of possession, defendants explained, was intended as a protection to plaintiff so that when Cooper decided to vacate the premises plaintiff's possession could not be put off until "20 years from now, or something like that." Defendants vigorously denied that by consenting to plaintiff's inclusion of a specific date they intended to make any representation that there was no option in Cooper's favor. Thus LeRoy Applegate testified:
"Q. Mr. Applegate, there is a date, April 1, 1957, on this lease. Did you tell either Mr. Stackhouse or Mr. Hodgson or Mr. Middleton that the Cooper lease expired on April 1, 1957? A. I explained to them thoroughly it was one-year with an option of nine, and my wife explained the same thing to them. We both told them. They have got no argument on that.
Q. So the date of April 1st, 1957 was pulled right out of the air? A. He said, `We've just got to put some date onto it, so it would be sometime.'"
*8 Corroborative of the defendants' version that Hodgson had not been misled is the fact that Cooper's one-year term did not expire until May 15, whereas plaintiff was promised possession on April 1. Properly instructed, the jury could have inferred that not only the defendants but the plaintiff, who admitted that he "certainly knew" Cooper had a lease, had expected Cooper to vacate, whatever his rights, and, therefore, that plaintiff would have entered into a lease even had he known the true facts as to Cooper's option.
To prove damages, plaintiff attempted on the second day of the trial, through Cooper's testimony, to show his earnings from the operation of the gas station so as to provide a guide by which the jury could measure plaintiff's own lost profits. He was asked how many gallons of gasoline he sold monthly or yearly, but his estimates, based on memory, were vague and contradictory. He could not estimate his expenses. He attempted to refer to a paper which purported to reflect the gallonage sold, but it was not in his handwriting and he did not know when or by whom the figures had been transcribed. An objection to his use of the paper was sustained. Cooper's most significant testimony pertaining to profits from the gas station was that he was able to live off that station and that his "living costs are somewhere in the neighborhood of between 8 and $9,000.00 a year." He had income from other sources but he "derived 95% or 90%, possibly, of all the income from the gasoline station." He did not recall how much income tax he had reported for 1957 and had no idea how much he had earned.
Plaintiff also attempted to prove lost profits by introducing evidence of the profits of his son's service station in Pemberton, N.J., about seven miles from the station tenanted by Cooper. The son's accountant testified that the Pemberton station showed a net profit of $12,906.92 for a 10 1/2-month period during 1957. The accountant's records, however, were based upon gross sales, and he could not estimate that proportion of the gross income of $78,507.26 attributable to sales of gasoline and that attributable to minor repairs and sales of accessories. In addition, there was little evidence *9 to indicate that the stations were comparable. Cooper's station is in a rural area and most of the sales are to transients; the other is in a small town and apparently has a more steady clientele.
The trial judge submitted the case to the jury after a relatively brief charge. He instructed that the action was one for "alleged misrepresentations" by defendants concerning the "term and option" in Cooper's lease. Aside from the matter of burden of proof, this statement of the issues constituted the entire charge as to what was necessary to establish defendants' liability, notwithstanding that plaintiff had pleaded and presented, in addition to the fraudulent misrepresentation theory, a clear case of breach of contract. When the jury returned to the courtroom with a question, the judge replied: "You are only concerned with whether or not there was a misrepresentation to induce the signing of the memorandum and the lease." However, neither in the original charge nor in the supplemental instruction did the trial judge instruct as to the essential elements which are required to make a fraudulent representation actionable. On the question of substantive liability, the charge was woefully inadequate.
On the subject of damages the judge charged that plaintiff sought "to recover his loss by not being able to take possession by reason of the prior lease, and that is where you may have some difficulty." The jury was instructed to evaluate the similarity between the gas station at Pemberton and Cooper's station and to consider the "statements of Mr. Cooper as to what he has done in that station by way of business. Again, no actual figures, but his approximation." The court summarized: "So, this matter of damages I necessarily must leave entirely in your hands * * *." (We note at this point that this charge, particularly the statement that it was on the issue of damages where the jury would have some difficulty and the last-quoted instruction that the issue of damages would be left entirely to the jury, could well be construed as the practical equivalent of a directed verdict for plaintiff on the issues of substantive *10 liability  and this although no motion had been made therefor and although the proofs clearly indicated such issues were for the jury.)
At the conclusion of the charge, the judge asked if there were any exceptions, and defense counsel answered: "The charge is satisfactory, your Honor." As noted, the jury returned a verdict of $8,500 for the plaintiff. No motion for a new trial was made by defense counsel within the ten-day period as provided in R.R. 4:61-2, and no appeal was taken from the judgment entered on the verdict.

II.
Defendants then engaged another attorney (present counsel) who moved to set aside the judgment under R.R. 4:62-2. At the hearing on the motion, defendants' newly retained counsel argued the merits of the court's charge, contending that there was no evidence to support a case of fraud, and that the measure of recovery for fraud was limited to plaintiff's deposit of $10. He also contended that the case was tried on the theory of breach of lease, and that the measure of damages is the difference between the value of the lease at the time of the making thereof and the rent reserved. The court declined to consider these contentions as a basis for an application to vacate the judgment on the ground that these are matters pertaining to errors of law to be raised on appeal.
In support of the claim of newly discovered evidence, defendants presented the testimony of Frederick T. Crowley, the accountant for Cooper, and the testimony of the defendant, Mrs. Applegate, concerning conversations with Crowley, to show that Cooper had testified falsely as to his earnings from the gas station. Crowley is a resident of Pennsylvania and happens to be the accountant for both Cooper and the Applegates. On May 14, 1958, when he came into this State, he was subpoenaed to testify at the hearing on the motion to vacate on June 18. Crowley testified that between April 3 and 5, 1958 he had told defendant LeRoy Applegate that *11 Cooper had in fact suffered a loss from his operation of the station in 1956. At the time, Crowley promised to appear at the trial and so testify. On the morning of the trial's third day, April 9, 1958, however, he telephoned defendants at 7:30 or 8:00 A.M. and advised them that his conscience would not permit him to breach his confidential relationship with Cooper. At that time he had not informed defendants of the amount of Cooper's loss, but after being subpoenaed on May 14, Crowley did show them a statement, signed by Cooper, that his 1956 loss was $13,400. He had Cooper's 1956 income tax records and business statements with him at the hearing, but the court would not permit defendants to examine them and would not receive them in evidence.
Clara Applegate, the next witness at the hearing on the motion, categorically denied that she had learned from Crowley prior to the trial that Cooper had sustained a loss in 1956. She stated that on April 4, 1958 (Good Friday) Crowley "wasn't able to answer you on anything," and that the first time she spoke to Crowley on the subject of Cooper's loss was on the evening of the second day of the trial, April 8, 1958. Mrs. Applegate implied there was no reason to consult Crowley as to Cooper's possible losses until Cooper took the stand and testified that he had made a profit at the gas station, and that as soon as he did, she telephoned Crowley to ascertain the facts. She testified that Crowley told her on April 8, 1958 that Cooper had a loss, the amount of which was not then disclosed, and that he promised to testify the next morning. On the next morning, however, Crowley called and advised that he would not testify. She admitted having knowledge of the loss on April 9, but explained that she conceived it to be the function of defendants' trial counsel to bring the situation to the attention of the court.
Defendants' attorney then announced that Cooper was in the courtroom in response to a subpoena but that he should not be called to give testimony which might be self-incriminating. Cooper, however, voluntarily testified at the *12 request of the court. He said he could not recall whether his income tax return disclosed a profit or loss; he declared he had other sources of income beside the gasoline station in question; and he declined to examine the tax returns which were in the courtroom. Thus, it appeared that in 1956 Cooper might have reported a loss of $13,400 and not a profit of $8,000 or $9,000 as he implied in his testimony. However, whether the operation of the gas station resulted in a profit or loss was not established because the income tax return also included his other ventures. Reference to the income tax records or to Cooper's books (which had been subpoenaed and which were outside in his automobile) would have revealed the facts, but the court's ruling prevented ascertainment thereof.

III.
Defendants appeal from the order denying their motion to set aside the judgment, charging generally that the order was an abuse of the discretion vested in the trial judge under R.R. 4:62-2. The rule, so far as is here pertinent, reads as follows:
"On motion, with briefs, and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment, order or proceeding and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:61-2; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released, or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order. The motion shall be made within a reasonable time, and for reasons (a), (b) and (c) not more than 1 year after the judgment, order or proceeding was entered or taken."
Numerous grounds are presented in support of the claim that the verdict of $8,500 for plaintiff was the product of *13 "basic error" (defendants' terminology) or "mistake" in the conduct of the trial and in the charge, R.R. 4:62-2(a), including: (1) defendants' evidence that plaintiff and his attorney at the time of the execution of the Hodgson lease were on notice of defendants' outstanding lease to Cooper, was never rebutted, and therefore there could have been no justifiable reliance on the alleged misrepresentation to the contrary; (2) the real understanding of the parties was that the Hodgson lease was to be subject to the rights of the tenant in possession; (3) the anticipated profits in the present case were too remote, speculative, and problematical to afford a measure of damages for breach of lease or for fraud; (4) plaintiff was required to elect his remedy because breach of contract and fraudulent misrepresentation theories are inconsistent; (5) the trial judge deprived defendants of due process of law and trial by jury by failing to submit their counterclaim to the jury; (6) failure to charge on breach of lease; and (7) failure to charge on the component elements of fraud or misrepresentation. In addition, defendants urge that Crowley's testimony as to Cooper's loss in 1956 was newly discovered evidence which would probably have altered the judgment and which could not have been discovered in time to move for a new trial. R.R. 4:62-2(b).

IV.
We deal with the last-mentioned contention first. To warrant disturbance of the judgment on the ground of newly discovered evidence, the party seeking relief must demonstrate that the new evidence is material to the issues tried, that it has in fact been discovered since the former trial and could not, by the exercise of due diligence, have been discovered before such trial or in time to move for a new trial under R.R. 4:61-2, and that it probably would change the result if a new trial were granted. R.R. 4:62-2(b); State v. Bunk, 4 N.J. 482, 486 (1950); State v. Richter, 21 N.J. 421, 424 (1956); State v. Emery, 27 N.J. 348, 357 (1958); Cheel Construction Co. v. Lubben, *14 35 N.J. Super. 198, 203 (App. Div. 1955); 49 C.J.S. Judgments § 273, p. 493; Restatement, Judgments, § 126 (d).
It is a reasonable assumption that the testimony of Crowley and Mrs. Applegate as to Cooper's having sustained a loss in his operation of the gasoline station in 1956 probably would have altered the judgment. The testimony adduced at the hearing on the motion, however, reveals a sharp conflict between the defendants and their witness Crowley as to the date when the latter advised the defendants of the fact of Cooper's loss. Yet, even accepting Mrs. Applegate's version of the affair, it appears that the defendants had the information on the second day of the trial and knew on the morning of the third day of trial that Crowley had reconsidered his promise to testify. These matters should have been brought to the attention of the court, either by moving for a continuance during which an effort could have been made to have Crowley's deposition taken in Pennsylvania or by having Cooper's records subpoenaed. Moreover, although Crowley was an out-of-state resident, Pennsylvania, like New Jersey, has no statute changing the common-law rule that communications between client and accountant are not privileged (consult 97 C.J.S. Witnesses § 255, p. 742; 8 Wigmore, Evidence (3d ed. 1940), § 2286, p. 537, n. 14), and defendants could have had his deposition taken pursuant to R.R. 4:18-2 during the pretrial stage of the proceedings.
Defendants seek to excuse their failure to make use of pretrial discovery procedures by arguing that there was no reason to examine Crowley since "defendants had a right to believe that Cooper, the tenant in possession, would tell the truth at the trial," and "no amount of diligence can anticipate perjury." This contention, although enjoying surface allure, cannot be sustained. R.R. 4:62-2(b) contemplates the very situation that confronted defendants in providing that relief is granted only when the new evidence could not have been discovered in time to move for a new trial under R.R. 4:61-2, i.e., ten days after the entry of the verdict. The defendants "discovered" the alleged fraud and perjury during the trial, and, although they were not *15 apprised until sometime in May that Cooper's 1956 tax return actually showed a loss to the extent of $13,400, their failure (and that of their trial counsel) to act within the following ten-day period on the basis of the limited information concededly known to them at that time did not rise to the level of "due diligence" required by the rule. Since the situation with respect to Cooper's business losses was in fact discovered by defendants, we need not consider whether or not it "could have been discovered" within the meaning of the rule. There was no abuse of discretion in refusing to set aside the judgment for this reason. Shammas v. Shammas, 9 N.J. 321, 330 (1952); Smith v. Smith, 17 N.J. Super. 128 (App. Div. 1951); Minter v. Bendix Aviation Corp., 26 N.J. Super. 268, 271 (App. Div. 1953), reversed on other grounds, 24 N.J. 128 (1957).
The foregoing is equally applicable to the defendants' claims that the judgment was the product of fraud or perjury. As to whether R.R. 4:62-2(c) applies where the fraud or misrepresentation is not legally attributable to the adverse party, see 7 Moore's Federal Practice (2d ed. 1955), par. 60.24[5], pp. 253-54.

V.
We are, however, persuaded that the judgment sought to be vacated was the product of a perfunctory handling of the case by defendants' trial attorney and of basic error by the judge in the conduct of the trial and in the charge to the jury. We have already had occasion to discuss the inadequacy of the charge on the substantive issues of breach of lease and misrepresentation and the fact that the charge, read as a whole, strongly implies that the jurors need not concern themselves with the liability aspects of the case. None of the essentials of fraud as set forth in such cases as Fischetto Paper Mill Supply, Inc. v. Quigley Co., 3 N.J. 149, 152-53 (1949), Trustees of Columbia University v. Jacobsen, 53 N.J. Super. 574, 577 (App. Div. 1959), and Byard v. Holmes, 34 N.J.L. 296 (Sup. Ct. 1870), can *16 be found in the charge, and this omission was especially prejudicial in view of the defendants' contention that they expected Cooper not to exercise his option to renew. Not only was the defendants' intention to deceive in issue, but it was also open to the jury to find that plaintiff, had he known that Cooper held the option, might have entered into the lease agreement notwithstanding knowledge of that fact. Moreover, the failure to charge at all on the alternative breach of lease theory, while normally prejudicial only to the plaintiff, in this case resulted in a determination of liability unsupported by any rule or principle of law.

VI.
As to that portion of the charge dealing with damages, the trial judge referred to the evidence offered by plaintiff  the profits at the Pemberton station and Cooper's testimony as to his business income  as factors to be considered in the measurement of the gains that might have accrued to plaintiff from defendants' promised performance. At the hearing on the motion to vacate and on this appeal from the denial thereof, defendants' present counsel challenges the propriety of a recovery based upon lost profits. The argument is that such hoped-for gains are too remote, speculative, and problematical, especially since the earnings of any particular service station vary widely, depending upon the quality of the service rendered by each individual entrepreneur.
In an action by a lessee against a lessor for failure to deliver possession, the tenant is in general entitled to recover the difference between the rental value of the premises and the rent reserved under the lease. Weiss v. Revenue Building & Loan Ass'n., 116 N.J.L. 208, 211 (E. & A. 1935); Adrian v. Rabinowitz, 116 N.J.L. 586, 591 (Sup. Ct. 1936). Where profits to be derived from the conduct or operation of a business on the demised premises are a factor in arriving at the rent to be paid by the tenant or in arriving at the value of the term, and this is in the contemplation of the parties at the time of the making of *17 the lease, recovery may be had for lost profits if the evidence affords a basis for estimating the damages with reasonable certainty.
"If the business is one that has already been established a reasonable prediction can often be made as to its future on the basis of its past history. Evidence as to its past expenditures and receipts and of the conditions under which the business was carried on is frequently held to afford a sufficiently certain basis for a verdict awarding damages for profits prevented." 5 Corbin, Contracts (1951), § 1023, p. 128.
"Doubts are generally resolved against the party committing the breach of contract." Restatement, Contracts, § 331(1), comment (c), p. 517.
See also Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144 (1950); Stanley Co. v. Hercules Powder Co., 16 N.J. 295, 314-15 (1954); Tessmar v. Grosner, 23 N.J. 193, 203 (1957); Casler v. Weber, 27 N.J. Super. 396 (App. Div. 1953); Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J. Super. 476, 482 (App. Div. 1958); McCormick, Damages (1935), § 29, p. 107 et seq.
The "benefit-of-the-bargain" rule may also obtain in computing damages in actions for fraud or deceit. Zeliff v. Sabatino, 15 N.J. 70, 74 (1954). And, insofar as such an action implicates an element of moral obliquity on the part of the defendant, it has been suggested that a lesser degree of certainty will be tolerated than in cases where the breach did not involve bad faith. See 5 Corbin, op. cit., supra, § 1020, p. 111, and § 1021, p. 118.
Evidence of the profits at the Pemberton station, although of little probative value, was a proper factor for the jury to consider. "In a few cases, the evidence of the record of profits of other business enterprises similarly situated may come in." McCormick, op. cit., supra, § 29, at p. 108. See also Stanley Co. v. Hercules Powder Co., supra, 16 N.J. at p. 315; 5 Corbin, op. cit., supra, § 1022, p. 123, text at n. 89. It was, of course, incumbent upon the trial judge to instruct the jury to evaluate the similarities and differences between the two stations, once he had permitted evidence of the Pemberton operation to be admitted.
*18 While we reject the notion that Cooper's past earnings were not a proper measure of damages, we are convinced that the method by which plaintiff attempted to prove Cooper's profits could not have been more unsatisfactory. As discussed earlier, Cooper's testimony was extremely vague and contradictory. In substance, the impression conveyed was that he draws 90% to 95% of his "living expense" from this particular business and that his "living expense" in 1956 and 1957 was "in the neighborhood of $8,000 to $8,500 a year." (The last-mentioned sum is the amount of the verdict.) In view of the uncertainty with which Cooper himself testified, we think the bare instruction, "* * * you have the statements of Mr. Cooper as to what he has done in that station by way of business," was inadequate, especially when it is considered that Cooper said during his testimony that out of the $8,500 figure came other "things that I have to pay * * * including my salary * * * and my food and my travel, and my business, and so on." In our judgment, fairness to the defendants required a precautionary instruction as to the deficiencies and qualifications inherent in, and the weight to be accorded to, Cooper's estimates.

VII.
Without considering the other grounds for reversal presented by the defendants, what has been said thus far indicates such an extreme departure from the proper functioning of the adjudicative process in the trial court as to compel the conclusion that the defendants will be the victims of a manifest injustice if the judgment is permitted to stand. We have no doubt that had the judgment in question been the subject of an appeal under R.R. 2:2-1, the proper method of reviewing errors of law by the court in the trial of a cause, it would have been reversed under R.R. 1:5-3(c). The question is whether, under the circumstances of this case, defendants are to be deprived of similar relief because of their failure to move for a new trial within the ten-day period after the entry of the verdict, R.R. 4:61-2, because *19 of their failure to appeal directly from the judgment within the 45-day period allowed by R.R. 1:3-1(b), and because of their failure to apply for a 30-day extension of the time for appeal under R.R. 1:27B(d). Plaintiff's position on this phase of the case is that to permit defendants to complain of trial errors through the use of R.R. 4:62-2 would defeat the mandatory provisions of R.R. 1:27B(c) and (d) by indirection.
There is no doubt that R.R. 4:62-2 is not, under ordinary circumstances, an appropriate vehicle by which trial errors of the kind here complained of may be reviewed. Many of the authorities suggest that subsection (a) of the rule, which permits relief from a judgment on the grounds of "mistake," must be construed as limited to mistakes of fact, not of law, lest other provisions of the rules fixing time limitations upon motions for new trials and upon appeals be emasculated. Mayflower Industries v. Thor Corp., 17 N.J. Super. 505, 511-12 (Ch. Div. 1952); 49 C.J.S. Judgments § 280(b), and (e) (2), pp. 501, 508.
"As a general rule, no appeal will lie where the matter raised by the appeal from an order vacating or refusing to vacate the judgment, decree or order could have been raised by an appeal from the original judgment, decree or order." 4 C.J.S. Appeal & Error § 132 (b), p. 420.
Hudson Bus Transp. Co. v. Board of Pub. Util. Com'rs., 131 N.J.L. 576, 578 (Sup. Ct. 1944). See also 3 Barron and Holtzoff, Federal Practice and Procedure, § 1322, p. 395, commenting on the corresponding Federal Rule 60(b). Cf. In re Nuese's Estate, 15 N.J. 149, 158-159 (1954).
The leading authority sustaining defendants' position that "mistake" as used in R.R. 4:62-2(a) and F.R.C.P. 60(b) (1) encompasses judicial error is 7 Moore's Federal Practice (2d ed. 1955), par. 60.22[3], pp. 237-38, where it is said:
"Yet if the Rule is construed to authorize a motion for relief from a judgment because of judicial error, then an appeal will subsequently lie from a final decision on the motion for relief, and appeal time will have been indirectly extended, at least where the alleged *20 judicial error involved in the appeal from the 60(b) decision is the same that could have been raised on appeal from the original judgment. On the other hand, * * * we believe that there should be sufficient flexibility in the Rules so that the district court has the power under 60(b) (1) to grant relief for error of law apparent, on motion made within a reasonable time."
After defining a "reasonable time" as not exceeding the time for appeal from the original judgment, Professor Moore concludes:
"So limited, a motion for relief under 60(b) (1) does not unduly affect the sound principle of finality, nor the general principle that 60(b) is not a substitute for appeal."
For reasons to be discussed infra, it is not necessary for us to decide which is the preferable view. Having in mind that relief under R.R. 4:62-2 rests within the sound discretion of the trial judge and is to be dispensed or withheld according to equitable principles (see, e.g., Goldfarb v. Roeger, 54 N.J. Super. 85, 92 (App. Div. 1959)), we eschew an attempt to set forth with any particular degree of specificity the precise meaning of the concededly broad terms of subsection (a). And any effort to mark the outer limits of the catch-all provision in subsection (f), providing for relief for "any other reason justifying relief from the operation of the judgment or order," would similarly defeat the manifest purpose of the rule to ensure a discretionary appraisal of the facts of the particular case. Furthermore, under the circumstances of the case, we find it unnecessary to decide whether the trial judge properly exercised his discretion in refusing to set the judgment aside for reasons cognizable under R.R. 4:62-2. Although we are not compelled to make such a determination, it is clear that the trial judge's ruling was based upon the strictest possible interpretation of the rule in every respect.

VIII.
Nevertheless, this is not a case of a flagrant, deliberate, or even unexplained violation of the rules governing the time for appeals. It will be remembered that when defendants *21 served notice of the motion to vacate on May 13, 1958, 34 days after the entry of the judgment, they still had 11 days in which to appeal directly from the judgment itself. R.R. 1:3-1(b). Defendants' present counsel had been retained on or about April 30, 1958. His clients informed him that the judgment entered against them on April 9 was the product of Cooper's false testimony. Thinking this was the only ground for having the judgment set aside, counsel (who says he "had not the slightest idea as to what was contained in the trial records or in the proceedings" because he did not receive a transcript from the court reporter until May 19) proceeded with the utmost speed to bring the matter to the attention of the trial court by the motion to vacate. The return date of the motion was May 23. (There was an adjournment to June 18.) The time for appeal expired on May 24. Thus counsel had five days, from May 19 to 24, to examine a compendious transcript and record, detect plain errors (and we agree these are more difficult to find when one does not "know what he is looking for"), evaluate the prospects for a reversal on the newly discovered evidence ground as opposed to the ground of plain error, and, if the latter appeared more cogent, to abandon the motion to vacate by filing a notice of appeal (thereby depriving the trial court of jurisdiction). Consider also that counsel obviously believed that the trial errors could be reviewed in an R.R. 4:62-2 proceeding as well as on a direct appeal (see above), and therefore that the choice to proceed in the trial court would not involve any foreclosure of the defendants' right to present such grounds for reversal upon an appeal from the order denying the motion to vacate. Moreover, present counsel may well have reasoned that if a direct appeal were taken, the appellate court would only remand the matter to the trial court in any event for the taking of Crowley's testimony as to Cooper's business losses. Finally, it may have occurred to counsel, as it has to us, that the motion to vacate on the ground of newly discovered evidence might have the effect of tolling the time for appeal from the original judgment.

*22 IX.
The last point requires amplification. Under R.R. 1:3-3(f), the time for appeal is tolled by a motion for a new trial under R.R. 4:61, by a motion for amendment of the judgment under R.R. 4:53-2, or by a motion for judgment under R.R. 4:51-2. If a motion under R.R. 4:62-2 to set aside a judgment were also specifically enumerated therein, there would have been no question in this case but that the defendants, who filed a notice of appeal on the sixth day following the order denying the motion (i.e., on what would have corresponded to the fortieth day after the entry of the judgment), could have appealed from the judgment itself after the trial court's refusal to set it aside.
We perceive no persuasive argument for distinguishing in civil cases between a motion for a new trial and one to set aside a judgment in respect to whether or not the time for appeal is tolled. As stated, such a distinction is in effect made under the present rule, R.R. 1:3-3(f). Certainly there is no basis for treating an R.R. 4:62-2 motion differently in cases where it is made within the ten-day period following the entry of the judgment. It is, of course, true that giving litigants the opportunity to toll the time for appeal by moving to vacate allows them to extend the time within which to appeal. But parties who would arbitrarily employ the tactic are presently able to accomplish the same result by moving for a new trial within the ten-day period. The most workable solution, in our judgment, would be to provide for the tolling benefit where the motion to vacate is brought in good faith and not for the purpose of delay.
A comparable situation was presented in State v. Petrolia, 37 N.J. Super. 326 (App. Div. 1955), reversed on other grounds 21 N.J. 453 (1956). Petrolia was a criminal case in which the defendant's notice of appeal was filed one month beyond the three-month period specified in R.R. 1:3-1(a). The defendant contended that his motion for a new trial on the ground of newly discovered evidence under R.R. 3:7-11(a), even though not within the prescribed ten-day *23 period, was entitled to the tolling benefit granted by R.R. 1:3-3(c). The Appellate Division noted that under the present state of the rules the time for appeal continues to run despite the pending motion, and that the proper procedure is to file the notice of appeal and at the same time apply for a remand of the record so that the trial court can hear the newly discovered evidence. While the court granted the State's motion to dismiss the appeal, it nevertheless proceeded to consider the merits of the appeal. The Supreme Court, in reversing on the merits, 21 N.J. 453, held that the motion had no tolling effect, but that since R.R. 1:3-3(c) was subject to "misinterpretation even by astute counsel," the merits of the appeal would, as a matter of justice, be considered.
We are of like persuasion in the present case, which, inasmuch as it deals with R.R. 4:62-2 instead of with R.R. 3:7-11(a), is also a case of first impression. Indeed, in civil litigation, we see nothing to be gained by pressing parties into an election of procedural remedies  parties who have good grounds for appeal but who instead of engaging in the procedure recommended in State v. Petrolia, supra, 37 N.J. Super. 326, choose for financial or other reasons to proceed in the first instance under R.R. 4:62-2. The present state of the rules might well be re-examined in the light of the foregoing.

X.
We have not overlooked the fact that when the trial court denied defendants' motion on June 18, 1957, there were still five days remaining of the 30 days beyond the normal 45-day limit in which this court may permit the filing of an appeal. R.R. 1:27B(d). Had defendants applied for this extension, it undoubtedly would have been granted, and had the appeal been filed promptly thereafter, it would have been submitted within the extended period permitted by the rule.
That the defendants did not do so is, of course, again attributable to counsel's belief that he would obtain an *24 appellate review of the merits of the case on the appeal from the denial of the motion to vacate.
As we noted above, there are reasonable grounds for doubt as to the scope of the relief available under R.R. 4:62-2, and defendants' interpretation is not an inconceivable one. We have refrained from passing on the validity of this interpretation, but we do feel that counsel's misconstruing the rule, if he did so, should not deprive defendants of an appellate review of the April 9 judgment which clearly could have been obtained but for his misunderstanding (again assuming it was a misunderstanding). This is not to say that ignorance of a rule will excuse non-compliance therewith. Rather, we say that in the particular circumstances here present, when the defendants refrained from appealing from the judgment itself under R.R. 2:2-1 because counsel had reasonable grounds to believe that the merits would be reviewed on an appeal from the denial of the motion under R.R. 4:62-2, we shall not construe the rules so strictly as to deny defendants a consideration of the merits. Cf. Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 214 (App. Div.), certif. denied 27 N.J. 398 (1958).

XI.
In view of the fact that defendants could have appealed to this court at the time of the motion to vacate but did not for the reasons discussed above, the policy in favor of terminating litigation is not present in this case. To the contrary, the only perceptible public interest involved is the obvious social gain that attends the setting aside of an indefensible judgment. Procedural rules are not inviolate. See, e.g., Martindell v. Martindell, 21 N.J. 341, 349 (1956). If we make them so, we shall have lost sight of the directive that:
"* * * whether a rehearing shall be accorded * * * depends upon, not whether those rules, designed in the main to prevent injustice, have been observed, but whether, in fact, injustice has been done." Sheridan v. Van Winkle, 43 N.J.L. 579, 584 (Sup. Ct. 1881).
*25 We are satisfied that, under the particular circumstances of this case, justice will best be served by considering defendants' present application as an appeal from the original judgment. For the errors outlined earlier in this opinion, the cause is remanded to the county court for a trial de novo on all issues. Let a mandate issue accordingly.
HANEMAN, J.A.D. (dissenting).
I am in accord with the conclusions of my colleagues insofar as the issue of newly discovered evidence and perjury is concerned, but dissent from their conclusion that defendants' present application should be considered as an appeal from the original judgment.
On April 9, 1958 judgment for plaintiff was entered in the Burlington County Court upon the verdict of the jury before whom the instant matter was tried. On May 19, 1958 (40 days after entry of judgment) defendants filed a notice of their intention to apply to the trial judge on May 23, 1958 "for an order to set aside the judgment * * * on the ground that [it] was obtained by fraud and that [they had] since obtained newly-discovered evidence which would probably alter the judgment, and on the further ground, as specified under R.R. 4:62-2(a), (b), (c) and (f)." On the return date of that notice the trial judge continued the matter to June 18, 1958. Thereafter, on June 5, 1958, defendants filed an amended notice of their intention to apply to the trial judge on the continued return date for an order setting aside the judgment entered on April 9, 1958. The grounds upon which defendants were to rely in seeking such an order are these:
"2. There was basic error committed in the record.
(a) The damages for breach of lease where no rent has been paid is the difference between the value of the lease and the rent reserved. The damages proved were loss of profits and are not the proper measure of damages for breach of lease.
(b) The case was tried and the Court charged the jury on the theory of fraud. There is no evidence in this case to substantiate the alleged claim of fraud.
3. There is basic error in the Court's charge to the jury.
*26 (a) The Court charged the jury on the theory of misrepresentation. There are no facts in the record from which misrepresentation can be inferred.
(b) If there were misrepresentation, the only evidence as to damages is the $10 paid by the plaintiff to the defendants.
(c) The Court charged the jury as to damages with respect to the business done by Hodgson at Pemberton, New Jersey and the business done by witness, Cooper. This is not a proximate and consequent measure of damages flowing from fraud."
On the return date the trial judge permitted defendants to take testimony on the issue of newly discovered evidence. Thereafter, on considering the briefs and affidavits submitted and the argument of counsel for both parties, the trial judge denied defendants' motion. From the order denying their motion, defendants appeal. No appeal was taken from the judgment of April 9, 1958 and no motion for a new trial, as such, was timely made.
Defendants urge that the trial court erred in that there was basic error or mistake in the conduct of the trial and in the trial court's charge to the jury.
R.R. 4:62-2, upon which defendants bottom their contention, reads, as far as here pertinent:
"On motion, with briefs, and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment, order or proceeding and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:61-2; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; * * * (f) any other reason justifying relief from the operation of the judgment or order."
The power to grant relief for the reasons cognizable under R.R. 4:62-2 rests within the sound discretion of the trial court. In exercising that power the trial court must act in the same manner as he is constrained to act under all cases addressed to his judicial discretion. That is to say, that he must not act in an arbitrary or capricious manner but must permit his discretion to be controlled by recognized *27 legal principles. That discretion, properly exercised, will not be disturbed on appeal. Wilford v. Sigmund Eisner Co., 13 N.J. Super. 27 (App. Div. 1951); Cheel Construction Co. v. Lubben, 35 N.J. Super. 198 (App. Div. 1955).
On their motion under R.R. 4:62-2(f) defendants sought relief before the judge who sat on the cause, by way of a review of errors committed at the trial, and they seek now, under the second ground urged on their appeal, to have those asserted errors reviewed in this court.
It is to be noted that no motion for a new trial was made by defendants within ten days of the judgment, R.R. 4:61-2; nor was appeal taken within 45 days of the judgment, R.R. 1:3-1(b), 2:3, although such an appeal would have been timely on the date when the original motion for relief from the judgment was made; nor has any application for an extension of time to appeal been made by defendants, R.R. 1:27B(d). Defendants make no explanation of their failure to pursue any of the above remedial procedures.
The original notice of motion did not specify "basic error" as a ground for relief. That reason was advanced for the first time in the amended notice of motion which was dated June 5, 1958. Its belated appearance comes, in point of time, 56 days subsequent to the date of the judgment, 46 days subsequent to the time limited for a motion for a new trial, and 11 days subsequent to the time limited for an appeal from the judgment.
The general rule makes the taking of an appeal within the time limited for such action, fundamental to appellate jurisdiction. In re Caruso's Will, 18 N.J. 26 (1955); State v. Walker, 14 N.J. 475 (1954); In re Nuese's Estate, 15 N.J. 149 (1954).
Defendants seek an avenue of review other than those made available to them by clear and express provisions of the rules governing the courts. They would emasculate the provisions of the rules which fix time limitations upon motions for new trials and upon appeals, by an interpretation of R.R. 4:62-2(f) which would entitle them (1) to seek relief before the trial court on the ground of error committed at the *28 trial, and (2) on the denial of such relief, to a full appellate consideration on the merits, as if an appeal had been taken in the first instance.
Trial error may be reviewed on a motion for a new trial or on an appeal to the proper appellate court. Questions such as those raised here, i.e., error in the conduct of the trial, rulings of the trial court, instructions to the jury and the weight of the evidence are, properly, matters to be reviewed in such proceedings. State v. Richter, 21 N.J. 421 (1956).
In addition to the opportunity for a plenary review of the trial, relief may be had in a proper case for reasons which could not be reviewed either on a motion for a new trial or on an appeal. Such reasons for relief would not appear in or form a part of the record of proceedings at the trial. Thus it is that R.R. 4:62-2 has a meaningful place in the scheme of our rules. Under that rule the trial courts are granted a broad discretionary power, exercisable under established principles, to control, vacate or correct their own decrees and thus prevent injustices. Cheel Construction Co. v. Lubben, supra. That power is not a new one. Our state courts have always enjoyed that power. Wilford v. Sigmund Eisner Co., supra. R.R. 4:62-2 merely declares the previously existing law. Shammas v. Shammas, 9 N.J. 321 (1952). And that there be no question of the right of the County Court to enjoy its benefits, the rule is made applicable to that court by R.R. 5:2-1. Relief for any reason allowed under the rule rests within the sound discretion of the trial court. The judicial discretion must not be arbitrary or capricious but must be exercised in accord with established principles. That discretion, properly exercised, will not be disturbed on appeal. Wilford v. Sigmund Eisner Co., supra; Schulwitz v. Shuster, 27 N.J. Super. 554 (App. Div. 1953); State v. Bunk, 4 N.J. 482 (1950); Clarkson v. Kelly, 49 N.J. Super. 10 (App. Div. 1958).
The rule delineates five specific areas under which relief may properly be granted. They are (a) mistake, inadvertence, surprise or excusable neglect; see Bowman v. Bambara, *29 28 N.J. Super. 92 (App. Div. 1953); Reilly v. Perehinys, 33 N.J. Super. 69 (App. Div. 1954); Tradesmens Nat. Bank and Trust Co. v. Cummings, 38 N.J. Super. 1 (App. Div. 1955); (b) newly discovered evidence which would probably alter the judgment, and which by due diligence could not have been discovered in time to move for a new trial under R.R. 4:61-2; see State v. Bunk, supra; (c) fraud, misrepresentation, or other misconduct of an adverse party; Balip Automotive Repairs, Inc. v. Atlantic Casualty Ins. Co., 7 N.J. 152 (1951); Ehnes v. King, 41 N.J. Super. 429 (App. Div. 1956), and see Shammas v. Shammas, supra; (d) the judgment or order is void, but see Garza v. Paone, 44 N.J. Super. 553 (App. Div. 1957); (e) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or vacated or it is no longer equitable that the judgment should have prospective application. None of the specific grounds stated in the rule contemplates the review of trial errors within the meaning of that term when applied to review by way of a motion for a new trial or an appeal.
The sixth or "other reason" clause of the rule is restricted in like manner and was designed to cover situations which would not fall within the grounds specifically designated and which would not be reviewable under the usual methods provided elsewhere in the rules. It was never the intent or purpose of that rule to afford a review of matters for which specific, explicit and exclusive avenues of review had been provided. In re Nuese, supra. Nor was the rule to provide an unfettered threat to the finality of judgments. Thus, by specific provision of the rule, motions made thereunder must be made within a reasonable time and in certain cases not more than one year after the judgment was taken. These time limitations work to hold inviolate the rights secured by a judgment, even though there be an occasional injustice. See Garza v. Paone, supra. The rule is an expression of the overriding policy which, in the interests of sound judicial administration, decrees that there be a point at which particular litigations shall terminate and there be a reasonable *30 stability to judgments of our courts. Garza v. Paone, supra; Naglieri v. Trabattoni, 14 N.J. Super. 54 (App. Div. 1951).
R.R. 4:62-2(f) is patterned and practically identical in phraseology with Federal Rule 60(b)6. The landmark federal cases construing this rule are Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949), and Ackermann v. United States, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950).
In Klapprott, the court had before it an application for the vacation of a default judgment with a prayer for a plenary trial. Klapprott, who had become a naturalized citizen of the United States in 1933, was a defendant in a denaturalization proceeding filed in the United States District Court in 1942. Klapprott was served with notice of said proceeding on May 15, 1942 and failed to answer the complaint within the prescribed 60 days. On June 7, 1942, before the expiration of the said 60 days, Klapprott was arrested and confined in a prison in New York on criminal charges brought by the United States. On July 17, 1942 the Federal District Court of New Jersey, on motion of the United States Attorney, entered a judgment by default against him. More than four years subsequent to that default judgment and while Klapprott was still a government prisoner, he filed a verified petition in the United States District Court praying for the relief above set forth. The United States District Court 6 F.R.D. 450 denied him the relief sought and was affirmed in this conclusion by the United States Court of Appeals. 3 Cir., 166 F.2d 273. The facts concerning the various legal proceedings taken against Klapprott, his incarceration on charges which the government was unable to sustain, and the condition of his health, are related at length in the opinion of the United States Supreme Court. That court, in granting Klapprott the relief sought, said (335 U.S. 601, 69 S.Ct. at page 390, 93 L.Ed. at page 277):
"The basis of his petition was not that he [movant] had neglected to act in his own defense, but that in jail as he was, weakened from illness, without a lawyer in the denaturalization proceedings or funds to hire one, disturbed and fully occupied in efforts to protect *31 himself against the gravest criminal charges, he was no more able to defend himself in the New Jersey court than he would have been had he never received notice of the charges." (emphasis supplied)
"The undenied allegations already set out show that a citizen was stripped of his citizenship by his Government, without evidence, a hearing, or the benefit of counsel, at a time when his Government was then holding the citizen in jail with no reasonable opportunity for him effectively to defend his right to citizenship. Furthermore, the complaint in the denaturalization proceeding strongly indicates that the Government here is proceeding on inadequate facts, just as it did in the criminal cases it brought against petitioner. For if the Government had been able on a trial to prove no more than the particular facts it alleged in its denaturalization complaint, it is doubtful if its proof could have been held sufficient to revoke petitioner's citizenship."
"Petitioner is entitled to a fair trial. He has not had it. The Government makes no claim that he has. Fair hearings are in accord with elemental concepts of justice, and the language of the `other reason' clause of 60 (b) is broad enough to authorize the Court to set aside the default judgment and grant petitioner a fair hearing."
In Ackermann, it appeared that Hans and Freda Ackermann and Max Keilbar were as well defendants in denaturalization actions. Ackermann and Keilbar were represented by counsel and filed answers to the complaints. After an order of consolidation and trial, separate judgments of denaturalization were entered against each of the defendants. Keilbar appealed to the Court of Appeals and by stipulation with the United States Attorney the judgment was reversed and the complaint against him was ordered dismissed. Ackermann failed to appeal. More than four years after the entry of judgment against Ackermann, he petitioned the court to set aside the judgment under Federal Rule 60(b), seeking to excuse his failure to appeal, for various reasons, and alleging that he would show that the judgment of denaturalization was unlawful and erroneous by producing the record in the Keilbar case. The United States Court of Appeals, 5 Cir., 178 F.2d 983; 179 F.2d 236, affirmed the District Court in its denial of Ackermann's application. The Supreme Court detailed Ackermann's excuse for failure to appeal as follows:
*32 "But petitioner seeks to bring himself within Rule 60 (b) (6), which applies if any other reason justifying relief' is present, as construed and applied in Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266. The circumstances alleged in the motion which petitioner asserts bring him within Rule 60 (b) (6) are that the denaturalization judgment was erroneous; that he did not appeal and raise that question because his attorney advised him he would have to sell his home to pay costs, while Kelley, the Alien Control officer, in whom he alleges he had confidence and upon whose advice he relied, told him `to hang on to their home' and that he would be released at the end of the war; and that these circumstances justify failure to appeal the denaturalization judgment." [340 U.S. 193, 71 S.Ct. 211.]
In assaying plaintiff's argument the court said (340 U.S. 193, 71 S.Ct. at page 212, 95 L.Ed. at page 211):
"By no stretch of imagination can the voluntary, deliberate, free, untrammeled choice of petitioner not to appeal compare with the Klapprott situation. Mr. Justice Black set forth in order the extraordinary circumstances alleged by Klapprott."
And again (340 U.S. 193, 71 S.Ct. at page 213, 95 L.Ed. at page 212):
"From a comparison of the situations shown by the allegations of Klapprott and Ackermann, it is readily apparent that the situations of the parties bore only the slightest resemblance to each other. The comparison strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60 (b) has no application to the situation of petitioner. Neither the circumstances of petitioner nor his excuse for not appealing is so extraordinary as to bring him within Klapprott or Rule 60 (b) (6)."
See also Collins v. City of Wichita, Kansas, 254 F.2d 837 (10 Cir. 1958); Hines v. Royal Indemnity Company, 253 F.2d 111 (6 Cir. 1958).
It therefore appears that the "other reason" clause of the rule vests power in the courts adequate to enable them to grant relief whenever such action is appropriate to accomplish the ends of justice. Klapprott v. United States, supra; Hogan v. Hodge, 6 N.J. Super. 55 (App. Div. 1949). Such *33 power, however, may not be exercised for a review of the matter on the merits, absent most extraordinary circumstances. Ackermann v. United States, supra.
The defendants voluntarily, deliberately and freely exercised an untrammeled choice to pursue the course here adopted. They elected not to avail themselves of the remedies provided by way of a motion for a new trial or appeal, but rather elected to proceed under R.R. 4:62-2(f). That rule is no substitute for appellate proceedings, otherwise provided for, nor may trial error be argued upon an appeal from denial of a motion made thereunder. Cf. State v. Richter, supra (21 N.J. 421). That rule may not be considered as granting any right to review legal error, absent most extraordinary circumstances which explain and excuse a failure to seek relief under other procedures provided in the rules and within the limited time periods. See, e.g., R.R. 1:3-1; 4:61-1.
Since defendants did not so move or appeal, and have not shown such unusual or extraordinary circumstances to excuse their failure, both the trial court and this court are barred from considering the asserted legal errors. In re Pfizer's Estate, 6 N.J. 233 (1951). It follows that the trial court did not abuse his discretion.
Nor can we consider the appeal as timely made. Under R.R. 1:3-3 are delineated certain specific situations in which the running of the time for appeal will be tolled. A motion under R.R. 4:62-2 is not among the specific items which will toll the running of the time. Had it been the intention of the Supreme Court to permit the running of the time for appeal to be tolled by a motion under R.R. 4:62-2 that rule would have been incorporated in R.R. 1:3-3. The Supreme Court has reviewed cases in which the rule was applicable many times and the rule was amended as recently as 1958 to include the reference to a denial of a motion for judgment under R.R. 4:51-2. The designation of specific causes which will toll the running of the time and the failure to include reasons cognizable under R.R. 4:62-2 is persuasive of an intention not to accord a tolling effect to motions made *34 under that rule. It follows that the time for appeal in this cause ran from the date of the judgment and the running of the time was not tolled by the post-trial motions under R.R. 4:62-2.
Petrolia (21 N.J. 453), as noted, was a criminal cause. Petrolia moved for a new trial under R.R. 3:7-11. Under that rule such a motion "may be made at any time." The relevant tolling provision is R.R. 1:3-3(c). It reads:
"The running of the time for an appeal from a final judgment in criminal causes shall be tolled by a motion for a new trial * * * made within 10 days after the determination of guilt * * *." (emphasis supplied)
Speaking to the problem of the timeliness of Petrolia's appeal the Supreme Court adverted to his argument that the phrase "determination of guilt" might refer "to the entry of the formal judgment of conviction" in which case his motion, which was made within ten days of the entry of the formal judgment, would have tolled the running of the time for appeal. The court rejected Petrolia's argument but, recognizing that the rules were ambiguous, it reviewed the matter on its merits. It is clear, however, that the court intended to terminate any doubts which may have existed. The tocsin was sounded for all those who would follow the Petrolia method and notice was given of the proper interpretation to be accorded R.R. 1:3-3(c) and the referable trial rule, R.R. 3:7-11.
The tolling provisions relating to civil actions are much more precise and this because the civil rules are more expansive. No such ambiguity, as was present in the criminal rules, inheres in those governing civil actions. The tolling provision applicable to the present cause, R.R. 1:3-3(f) provides that "[t]he running of the time for appeal from a trial court in civil causes shall be tolled by a timely motion made pursuant to any of the rules in this paragraph hereinafter enumerated * * *." The rules therein enumerated are R.R. 4:51-2 (relating to motions for judgment at the trial); R.R. 4:53-2 (relating to factual findings by the *35 trial court); R.R. 4:61 (on a motion to amend or alter a judgment); and R.R. 4:61 (on a motion for a new trial). The specificity of the rule in civil causes stands in startling contrast to the comparable criminal cause provisions.
The rules are designed to facilitate business and advance justice. They may be relaxed where strict adherence will work injustice. It is recognized, however, that there are certain instances in which, regardless of merit, the rules may not be relaxed. R.R. 1:27B(c), (d). Among the inviolable rules is R.R. 1:3-1 relating to the time for appeal beyond a 30-day extension which may be granted on a showing of good cause. The present appeal finds us, in point of time, beyond the extended time period permitted under R.R. 1:27B.
To permit this appeal to go forward as one from the original judgment is to create an imbalance in the orderly administration of the court system and a concomitant injustice upon those who are governed by the rules of court.
As between a policy which would afford this litigant relief and one which looks to preserving the integrity of the rules so that courts, counsel and litigants will have some assurance of where they stand when a judgment is entered, the equities weigh in favor of the latter. Certainly no one can complain that the rules do not afford a method whereunder a full and fair opportunity to review may be had. The expansion of the opportunity for review solely to accommodate a difficult cause must have a weakening effect upon judicial administration.
I would affirm.